IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jimmy G. Gilchrist, Sr., #242834, | Civil Action No. 6:06-1236-MBS-WMC |
| Petitioner, | |
| | **REPORT OF MAGISTRATE JUDGE** |
| vs. | |
| George T. Hagan, Warden of Allendale Correctional Institution; and Henry D. McMaster, Attorney General of South Carolina, | |
| Respondents. | |

The petitioner, a state prisoner proceeding *pro se*, seeks habeas corpus relief pursuant to Title 28, United States Code, Section 2254.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review posttrial petitions for relief and submit findings and recommendations to the District Court.

## FACTS PRESENTED

The record reveals that the petitioner is currently confined in the Allendale Correctional Institution of the South Carolina Department of Corrections ("SCDC") pursuant to commitment orders from the McCormick County Clerk of Court. The McCormick County Grand Jury indicted the petitioner at the September 1996 term of court for the murder of Thomas Wideman (96-GS-35-321). Attorney Thomas A. Mims represented him on these charges. A jury trial was held from July 28 through August 1, 1997, before the Honorable

William P. Keesley.  The jury convicted the petitioner of voluntary manslaughter and Judge

Keesley sentenced him to 17 years imprisonment.

       The petitioner timely served and filed a notice of appeal.  Assistant Appellate

Defender Robert M. Dudek represented him on appeal.  On October 1, 1999, the petitioner

filed his final brief of appellant, in which he presented the following issue for review:

> Whether the judge erred by allowing Sara Ann Cannady to
> testify that Ben Robertson was overheard predicting that
> appellant would shoot the decedent, since there was no
> evidence Robertson and appellant were conspiring to kill the
> decedent, and no evidence Robertson's statement was made
> in furtherance of a conspiracy?

The State filed a final brief of respondent on September 27, 1999.  Assistant Attorney

General Caroline Callison Tiffin represented the State on appeal.  On August 21, 2000, the

South Carolina Supreme Court affirmed the petitioner's conviction in a published opinion.

*The State v. Jimmy Gary Gilchrist, Sr.,* No. 25187 (S.C. S.Ct., filed Aug. 21, 2000); 536

S.E.2d 868 (S.C. 2000).  On September 5, 2000, the petitioner filed a petition for rehearing,

which was denied by the South Carolina Supreme Court in an order dated September 21,

2000.  The South Carolina Supreme Court sent the remittitur to the McCormick County

Clerk of Court on September 21, 2000.

       Meanwhile, on September 4, 1998, the petitioner filed a *pro se* petition for writ

of habeas corpus in this court, in which he alleged the following grounds (verbatim):

> (1)    The conviction of voluntary manslaughter should not be
> permitted to stand because malice is not an element or a part
> of voluntary manslaughter.
>
> (2)    The Transcript Testimony of the chief investigator of the
> sheriff department and state witness Tabitha Reid will show
> perjury and the prosecutor knowingly allowed their inculpatory
> testimonies known to be false to be presented to the jury doing
> trial.
>
> (3)    The jury was wrongly instructed regarding the burden of
> proving self-defense. The jury instruction impermissibly shifted
> the burden to the defended to show that he did not act with

2

malice because he acted in self-defense.  The State must bear the burden of proving every element beyond a reasonable doubt.  Malice is not a part of voluntary manslaughter.

(4)    The Trial Judge abused his discretion by failing to direct a verdict when self-defense was established and as a matter of law should have acquitted the defendant.

(5)    The prosecutor suppressed exculpatory evidence.

The respondents filed a motion for summary judgment and a return and memorandum in support of motion for summary judgment on November 18, 1998.  The petitioner filed his  opposition to the motion for summary judgment on November 25, 1998, and an "Amended and Supplemental Pleadings" on December 14, 1998.  The petitioner then filed a "Motion for Leave to Amend Supplement and Delete Claims" on June 10,1999. In that pleading, he indicated he wished to delete the issues he originally set out in his petition and, instead, present the following claims (verbatim):

(1)    The jury was wrongly instructed regarding the burden of self-defense, the jury instruction impermissible shifted the burden to the defendant to show that he did not act with malice because he acted in self-defense.

(2)    The trial judge abused his discretion when he refused to allow Petitioner to comment on evidence in closing argument that was waived by the State.

(3)    The trial judge abused his discretion by failing to direct a verdict when self-defense was established and as a matter of law should have acquitted the defendant based on the noted failure of proof.

(4)    Did the trial judge err by allowing the trial to continue when perjury was committed during trial by state witnesses.

(5)    The suppression of exculpatory evidence by the prosecutor affected the Petitioner trial.

(6)    The closing argument of the prosecutor was highly inflammatory and prejudice that it was not based on evidence but on emotion.

3

The respondents filed their supplemental return on June 15, 1999. The respondents filed a second supplemental return on July 12, 1999. On July 23, 1999, an order was entered by the Honorable Cameron M. Currie, United States District Judge, denying the motion for leave to amend and dismissing the petition without prejudice for failure to exhaust state remedies.

The petitioner then filed notice of appeal, in which he appealed the order dismissing the petition. On September 2, 1999, the petitioner filed a brief in which he presented the following issue (verbatim):

> Did the District Court abused its discretion when it denied the Plaintiff the right to timely amend, supplement, and delete claims in his Petition to withdraw the unexhausted claims and insert claims which were exhausted?

On March 1, 2000, the United States Court of Appeals for the Fourth Circuit issued an unpublished opinion in which it denied the certificate of appealability and dismissed the appeal on the reasoning of the District Court. *Gilchrist v. Weldon*, 208 F.3d 209, 2000 WL 232156 (4th Cir., Mar. 1, 2000) (Unpublished). The petitioner's petition for rehearing was denied as untimely by order filed March 21, 2000. The mandate was filed March 23, 2000. The petitioner then filed a motion for stay of mandate with a supporting affidavit dated May 10, 2000, which the court denied in a May 18, 2000, order.

The petitioner filed a petition for writ of certiorari in the United States Supreme Court dated May 24, 2000. The United States Supreme Court denied certiorari on April 30, 2001. *Gilchrist v. Weldon*, 532 U.S. 1012 (2001).

On December 11, 2000, the petitioner filed a *pro se* application for post-conviction relief (PCR) (00-CP-35-106), in which he alleged the following grounds for relief:

> (1)    Ineffective assistance of counsel.
>
> (a)    Counsel failed to request that self-defense be on the verdict form.

4

(b)    Counsel failed to object to the testimony of Tabatha Reed.

(c)    Counsel failed to object to the testimony of Deputy Gable.

(d)    Counsel failed to object to the prosecutor withholding exculpatory evidence in violation of <u>Brady v. Maryland</u>.

(e)    Counsel failed to object to the prosecutor's closing argument which was highly inflammatory

(f)    Counsel failed to research into the unconstitutional conditions of the Applicant's confinement upon conviction. Had counsel informed the Applicant of the unconstitutional conditions of confinement the Applicant would have insisted on challenging the judge's authority to sentence him.

(g)    Counsel was ineffective for failing to challenge the constitutionality of the sentence imposed when it was clear at the time of sentencing that the conditions to which the Applicant was being sentenced were unconstitutional.

(h)    Counsel was ineffective for failing to challenge the statute the Applicant was being sentenced under because a sentence of punishment violates South Carolina Constitution Article 12, Section 2.

(I)    The accumulation of errors and ineffectiveness by counsel prejudiced the Applicant.

(2)    Ineffective assistance of appellate counsel.

(a)    Counsel failed to challenge improper jury charge on self-defense.

(b)    Counsel failed to challenge the trial judge's denial of his motion for a directed verdict.

(c)    Counsel failed to challenge the trial judge's ruling denying the defense's motion to admit evidence of the victim's 1992 conviction of carrying a concealed weapon.

5

(d)     Counsel failed to challenge the trial court's refusal to allow trial counsel to comment on evidence in his closing argument.

(e)     Counsel failed to challenge the prosecutor's closing argument which was highly inflammatory and prejudicial.

(f)     Counsel failed to challenge the trial court's denial of his motion for a new trial.

(g)     Counsel failed to comply with the Applicant's request concerning the issues he wanted to address for direct appeal.

(h)     The accumulation of errors prejudiced the Applicant.

(3)     The manner in which the State has prescribed that the Applicant's sentence be served is unconstitutional.

The State filed its return on June 24, 2001. The Honorable James R. Barber held an evidentiary hearing into the matter on April 5, 2002, at the Lexington County Courthouse. The petitioner was present at the hearing and represented by attorney Donald R. McCabe. Assistant Attorney General Elizabeth McMahon represented the State.

On July 1, 2002, Judge Barber filed an order of dismissal in which he denied relief and dismissed the application with prejudice. The order addresses four allegations of ineffective assistance of trial counsel and four allegations of ineffective assistance of appellate counsel. Specifically, the order addresses the petitioner's claims that trial counsel was ineffective for failing to (a) "request self-defense as an option on the verdict form (b) object to Tabitha Reid's testimony (c) impeach Claude Gable, Jr.'s testimony, and (d) object to the solicitor's closing arguments at [transcript] pages 700, 703, 704, 706, and 710." The order also rejected the petitioner's allegations that "appellate counsel was ineffective for failing to raise on direct appeal the issues of (a) an improper self-defense instruction (b) the solicitor's improper comments (c) the trial court's denial of the victim's 1992 concealed

weapons conviction (d) the trial court's failure to direct a verdict in the Applicant's favor and (e) the trial court's failure to admit polygraph evidence." The petitioner filed a motion to alter or amend the order on August 2, 2002, was subsequently denied on September 4, 2002, as untimely and as an improper attempt at hybrid representation. *See Foster v. State*, 379 S.E.2d 907 (S.C. 1989) (PCR petitioner, represented by counsel, did not have any right to hybrid representation); *see also Koon v. Clare*, 527 S.E.2d 357 (S.C. 2000) (same). *State v. Stuckey*, 508 S.E.2d 564 (S.C. 1998).

A timely notice of appeal was served and filed. The petitioner made several motions to relieve counsel and eventually, he knowingly and intelligently waived his right to counsel and proceeded *pro se*. On April 9, 2003, he filed a petition for writ of certiorari, in which he presented the following questions (verbatim):

> (1)  Did the Post-Conviction Relief Court Err in Finding that the Petitioner received effective assistance of trial counsel when counsel failed to object to the prosecutor closing argument that was highly inflammatory and prejudicial that was not based on evid. but emotion?
>
> (2)  Did the Post-Conviction Relief Court Err in Finding that Petitioner received effective assistance of trial counsel when counsel failed to challenge the trial court lacked subject matter jurisdiction to sentence Petitioner to an uncinstitutional sentence and challenge the constitutionality of the statutes under the South Carolina Constitution Article Twelve (12) Subsection Two (2)?
>
> (3)  Did the Post-Conviction Relief Court Err in Finding that the Petitioner received effective assistance of trial counsel when counsel failed to object to the perjury testimony of Deputy Gable ...?
>
> (4)  Did the Post-Conviction Relief Court Err in Finding that the Petitioner received effective assistance of appellate counsel when counsel failed to challenge on direct appeal the trial judge abusing his discretion when he denied the defense motion to allow the Jury to learn that the deceased was convicted in 1992 of carrying a concealed weapon?

(5)    Did the Post-Conviction Relief Court Err in Finding that Petitioner's appellate counsel were not ineffective in failing to argue on direct appeal that the trial judge erred by failing to instruct the jury that Petitioner did not have the burden or proving self-defense, that the State had to disprove self-defense?

(6)    Did the Post-Conviction Relief Court Err in Finding that Petitioner['s] appellate counsel were not ineffective in failing to comply with his request concerning the issues he wanted to address for direct appeal?

(7)    Did the Post-Conviction Relief Court Err in Finding that Petitioner's appellate counsel were not ineffective in failing to argue on direct appeal that the statement admitted at trial that Sarah Canady attributed to Ben Roberson was not only hearsay but also violated the confrontation clause of the Petitioner right under the Sixth (6th) and Fourteenth (14th) Amendment of the United States Constitution?

(8)    Did the Post-Conviction Relief Court Err in Finding that Petitioner's appellate counsel were not ineffective in failing to argue on direct appeal that the trial judge erred in failing to give a requested charge, requested by defense counsel?

(9)    Did the Post-Conviction Relief Court Err in Finding that Petitioner's appellate counsel were not ineffective in failing to argue on direct appeal that the trial judge erred in only charging self-defense as set forth by this court in *State vs Davis*, 317 S.E.2d 452 (1984).

(10)    Did the Post-Conviction Relief Court Err in Finding that Petitioner's appellate counsel were not ineffective in failing to argue on direct appeal that the trial judge erred in [not] directing a verdict based on the noted failure of proof in favor of Petitioner

The State filed a return on September 3, 2003. The South Carolina Supreme Court issued an order granting certiorari on June 23, 2004. The petitioner filed an "Initial Brief for a Writ of Certiorari" on August 11, 2004, in which he presented the following question for review (verbatim):

"Whether Appellate counsel was ineffective for failing to raise issues regarding the adequacy of self-defense jury charge and

8

the refusal of the trial judge to give an appearance charge." And the effect of the error."

The State filed a brief of respondent on December 10, 2004. The South Carolina Supreme Court filed a published opinion on April 25, 2005, in which it affirmed the PCR court's denial of relief. *The State v. Jimmy Gary Gilchrist, Sr.,* No. 25973 (S.C. S.Ct., filed Apr. 25, 2005); 612 S.E.2d 702 (2005). The petitioner filed a petition for rehearing on April 29, 2005. The South Carolina Supreme Court denied the rehearing petition on May 18, 2005, and sent the remittitur to the McCormick County Clerk of Court on May 18, 2005.

In his *pro se* petition now before this court, the petitioner raises the following allegations (verbatim):

> **GROUND ONE:** Ineffective assistance of trial counsel
> **SUPPORTING FACTS:** Trial counsel was ineffective for failing to: (1) object to the prosecutor closing argument that was highly inflammary and prejudicial (2) Object to the perjury testimony of Deputy Gable. By counsel not objecting prejudiced Petitioner which resulted to an unfair trial.
>
> **GROUND TWO**: Ineffective assistance of appellate counsel
> **SUPPORTING FACTS**: Appellate counsel was ineffective for failing to: (1) argue that the State had to disprove self-defense (2) comply with his request concerning the issue he wanted to address for direct appeal (3) argue that the statement admitted at trial violated the confrontation clause of the U.S. Constitution (4) that the trial judge erred in failing to give a requested charge requested by trial counsel (5) that the trial judge erred in only charging self-defense as set forth in State vs Davis, 317 S.E.2d 452 (1984)
>
> **GROUND THREE:** Whether state supreme court erred in finding that State did not have to disprove self-defense beyond a reasonable doubt
> **SUPPORTING FACTS**: Petitioner argued on writ of certiorari that the self-defense jury charge was fundamental unfair and shifted the burden from the state to Petitioner to prove that he did not act in malice, counsel requested that the jury be charged that the State had to disprove self-defense once it was established beyond a reasonable doubt

On July 24, 2006, the respondents filed a motion for summary judgment. By order filed July 25, 2006, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the petitioner was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. The petitioner filed his opposition to the motion on September 11, 2006.

## STATEMENT OF THE FACTS

At trial, Vanessa Faye Wideman, an older sister of the victim, Thomas Wideman ("Wideman" or "the victim"), testified that she rode with their sister, Margaret, and a friend named Deborah Leverette to Freeman's night club between 11:00 p.m. and 11:30 p.m. on June 29, 1996. Shortly after they got to the club, the victim arrived with his friend, Johnny Lee Murray, and their cousin, Frank McDaniel. After about 45 minutes of drinking, dancing and socializing, the group decided to go outside because Wideman's group had liquor in their car, and the club only served draft beer. When they reached the car, all of them got inside, with the victim sitting in the driver's seat. App. pp. 67-68; 91-92. See also app. pp. 110-11 (testimony of Alma R. Freeman).

At some point, the petitioner approached the passenger side of their car and said to his brother-in-law, Ben Robertson, "Okay, man. Somebody['s] in the car now, hope they ain't too ignorant to let us out." Margaret asked what the problem was and if they wanted to get out of their parking place. She said it was "no problem" and instructed the victim to crank up the car and "let him out." The petitioner, however, said "Yeah, bitch. I hope you don't get too ignorant." App. pp. 68-69; 71.

With that, all of the car's occupants got out and, in obvious defense of his sister, the victim said, "You'll never be around a woman more special than my sister. Do you thinking I'm going to let you call her ignorant?" Although she did not know what else her brother may have said to the petitioner because she was preoccupied with trying to

10

keep her brother away from the petitioner, who was on the passenger side of the car, there never was any physical contact between the men; and the whole incident had "quieted down" within five minutes.  Wideman then got back into the vehicle and pulled it forward.  The petitioner left the parking lot in a blue pickup truck.  Because the owners of the club were outside, Vanessa went up and assured them that her group was not trying to instigate trouble.  They were told not to worry about it.  App. pp. 69-72.

Wideman, Vanessa, and their group returned to the bar and stood by one of two pool tables.  By now, it was close to 1:00 a.m. on June 30.  Wideman was fairly subdued and, for the most part, stayed by the pool table.  The petitioner and his brother-in-law, Ben Robertson, however, eventually returned to the club.  Robertson put his hand on Vanessa's shoulder, but she "shrugged him off and walked [away from him]."  The petitioner also approached within 10 feet of the table where Vanessa and Wideman were standing; and when Wideman asked why Robertson kept "looking in my face," she told him that if the petitioner and Robertson wanted to fight, he should "let them fight by [themselves]."[1]  App. pp. 72-76.

Because the club was preparing to close, Vanessa told her brother that she was going to the bathroom and for him to wait, so that their group could leave together.  He said "all right" and she turned to go to the bathroom.  She had only walked a few feet away from her brother when she heard a noise that "sounded like a firecracker."  When she turned around, her brother was lying on the floor.  The petitioner was standing over him and shot him two more times.  Once everyone realized what had occurred, "people started running and screaming."  Vanessa got pushed into the bathroom.  App. pp. 76-78; 86.

According to Vanessa, Thomas was not wearing a coat, his shirt was tucked in, and, to the best of her knowledge, he was unarmed.  She did not see him with a gun that

---

[1]The petitioner was nodding his head and staring.  Margaret was in the bathroom and Frank McDaniel was at the bar.  App. pp. 75-76.  Vanessa also asked her brother to leave at this point.  App. pp. 108.

11

evening, nor did she see one on him when she lay over his body after the shooting.  App. pp. 69-70; 8 -89.

Alma R. Freeman testified that she owns Freeman's Place and that it is open "from 6 until 2," Monday through Friday.  She entered the club shortly before 2:00 a.m. on June 30, after "they had just said it was the last dance."  When she went to turn the main light on, she saw the petitioner.  By the time she got to the drawstring to turn on the light, the petitioner went over to the pool table on which the victim was leaning and shot him.  As soon as she turned on the light, the petitioner looked at her, so she turned off the light and ran or crawled to the end of the bar, where she saw the petitioner shoot Wideman twice more.  App. pp. 109-113.[2]

After the shooting, the petitioner backed up with his gun in front of him.  Ms. Freeman's cousin, Charles, however, managed to take the gun away from the petitioner.  The petitioner then turned around and left.  Ms. Freeman did not see him again that evening.  Also, she saw Thomas Wideman before the shooting and did not see a gun in his hand.  She likewise did not see a gun on him after the shooting.  App. pp. 115-18.

Margaret Freeman Henderson, another sister of the victim, was also present at Freeman's Place on June 29-30, 1996.  She testified that her brother was 23 years old at the time in question, he had a "common-law wife" and he had two children.[3]  Like her sister, Vanessa, she had seen the petitioner before but did not know him.  Margaret testified that she, Vanessa and Deborah Leverette arrived at Freeman's club around midnight or so.  As soon as they arrived, they saw their brother, Thomas.  App. pp. 137-41.

Eventually, the group went outside and got into Johnny Murray's car.  The victim, who was seated on the front driver's side, opened the car's sun roof.  She

---

[2]Both Mrs. Freeman (App. pp. 112-14) and Vanessa (App. p. 78) testified that there was adequate lighting in the club so that they could see what happened.

[3]His daughter was four years old and his son was two years old.  App. p. 139.

corroborated Vanessa's testimony concerning the confrontation with the petitioner about moving the car. She indicated that she tried to stop the petitioner from going around to the driver's side of the car during the brief confrontation but he pushed her off of him and she went to the victim's side. Also, she told Robertson that the petitioner "don't have to argue about nothing like this." (She had known Robertson from school.) She corroborated Vanessa's testimony that there never was any physical contact between the men. App. pp. 141-45.

Eventually, the petitioner and Robertson left in a blue pickup truck and Margaret's group, including the victim, returned to Freeman's club. When she went outside 20-30 minutes later, Margaret saw the petitioner and Robertson return in the blue truck. She immediately went back into the club and asked the victim to leave "[b]ecause I just didn't feel right." The victim, however, refused to leave. He said, "Marg, we paid our money just like everyone else and we don't have to leave." She later saw the petitioner "leaning over a pool table watching my brother."[4] App. pp. 144-46.

Robertson was standing in front of the pool table on which she was leaning, and he put his hand on her shoulder when she walked by him, but she snatched away from him. Margaret went to the bathroom when "last call" was announced. "As soon as I got inside the rest room I heard a gunshot I heard a gunshot and then another one and then another one. Then, Vanessa came into the bathroom and said, "Thomas." App. pp. 145-47. When she came out of the bathroom, Margaret saw her brother lying on the floor and began asking people to call 911 for help. She corroborated Vanessa's testimony regarding how the victim was dressed and that he was unarmed that evening. App. pp. 147-49.

Frank McDaniel, the victim's 28-year-old cousin, also testified about the events surrounding the shooting. McDaniel testified that he had a gun in the glove

---

[4]His arms were folded and he was staring. App. p. 146.

compartment of Johnny Murray's vehicle.  This weapon "just kind of just stayed there."  It was unloaded but there was a clip in the glove compartment also.  McDaniel testified that the gun never left the vehicle that evening before the shooting and that McDaniel never saw the victim with a gun in his hand or his waistband that evening.  App. pp. 162-65.

> McDaniel's recollection of the shooting was that:
>
> > We were all standing over by the pool table ... and I decided to go up and get another beer for everybody and when I went to the bar by the DJ booth where they were serving ... somebody walked up to me and got my attention, and by that time I turned to my left and that's when I saw [Petitioner] running towards Thomas with ... maybe a gun in his hand.

App. pp. 165, ll. 10-17.  He was unsure how many shots the petitioner fired after the first shot.  By the time McDaniel reached the victim, the victim was on the floor.  After McDaniel left the club with Murray, their friend, Kevin Jennings, finally got the gun.  The group unsuccessfully searched for the petitioner and this was the last time McDaniel saw his weapon that evening.  App. pp. 165-167; 178-84.

Ellis Leroy "Butch" Payton was in Freeman's at the time of the shooting.  He had just sat out in the middle of the floor because his feet hurt from dancing.  He looked up and saw the petitioner approach him.  The victim was on Payton's left side and fell by the time he reached him.  Payton had seen "a hand go out" but did not hear the first shot, so when the victim's head fell on his feet, he kicked at the victim.  Payton then heard two more pops before everyone in the bar started running.  App. pp. 185-190.

Charles Freeman used to work at Freeman's, which he described as a dance club.  He is good friends with the petitioner and knew the victim "as an acquaintance."  Freeman had gone across the street "to get something" shortly after midnight, and the initial confrontation between the petitioner and the victim was ending by the time he returned.  When he asked the petitioner what was happening, the petitioner said "nothing really."

14

Freeman admonished him that he did not want any arguments in the club.  However, he could not recall if the petitioner left in his blue pickup truck.  App. pp. 195-98.

Shortly after "they said last song," Freeman heard a pop.  This caused him to stop and turn around.  He heard two more loud pops and he began walking toward the sound.  He then saw someone holding a gun and he went closer.  As he did so, he recognized his friend, the petitioner, who was "backing up." (sic).  After he twice instructed the petitioner to stop and not move, the petitioner did as he ordered.  The petitioner also gave him the weapon and left when Freeman told him to do so.  He later gave the petitioner's gun, a 9mm semi-automatic pistol (State's ex. 14) to law enforcement.  App. pp. 198-202.

Dr. Inas Yacoub, a forensic pathologist, performed an autopsy on the victim on July 1, 1996.  The victim's short-sleeved shirt was "densely soaked in blood," and it had bullet holes in it.  She found two bullet holes in the front of the shirt and a bullet hole in the back.  There was a series of bullet holes on the back of the left sleeve and a bullet hole on the back "on the top."  The lower bullet hole on the front had "fine powder particles" associated with it, as did the bullet hole on the right back.  App. pp. 224-28.

Dr. Yacoub's external examination of the victim revealed that he had a wound on the back of his right forearm that had entered and then exited.  There was a pattern of powder particles in a "three inch area," indicating that the gun was close to the forearm when fired.  There was an abrasion on the exit would (on the front of the forearm) that suggested that the forearm was close to a hard surface when the bullet exited.  There was also "a re-entrance" wound on his chest that was larger.  The bullet exited through the victim's left back.  This would fractured two rib bones and perforated the victim's left lung.  App. pp. 228-232.

Dr. Yacoub found a second wound "below and to right of the re-entrance wound" that also had powder particles associated with it.  The second wound hit the

15

breastbone, went through the diaphragm and the liver, hit the adrenal glad and "lodged in the back on the right side." Dr. Yacoub was able to recover this bullet and it was sent to the South Carolina Law Enforcement Division (SLED). Dr. Yacoub then found a third wound "on the right upper aspect of the back ... just below the shoulder blade." Again, there were powder particles associated with the portion of the shirt where this wound entered. This bullet went through the right lung, struck the spine at the ninth thoracic vertebra, hit the aorta and passed through the left lung, before finally exiting below the left armpit. This bullet caused bleeding in both chest cavities and Dr. Yacoub opined that she would not expect someone to be able to stand after receiving a wound such as this. App. pp. 232-33.

Any one of the wounds would have been fatal without medical treatment. The wound that entered just below the right shoulder blade and passed through the aorta and both lungs, would have been sufficient to disable a person and cause him to fall. Dr. Yacoub attached a special significance to wound one, the wound that entered the arm and passed through it and into the chest. She opined that the location of the wound on the right forearm and the re-entry on the victim's chest was consistent with the victim trying to use his forearm to protect himself from the weapon. Dr. Yacoub explained that all of the wounds she saw were "close-range wounds" that were fired between a foot and several inches away from the victim. App. pp. 233-44.

Sergeant Thomas Willis of the McCormick County Sheriff's Department testified that he responded to Freeman's Club after the shooting and saw the victim still laying on the floor near a pool table. Charles Freeman gave him the weapon the petitioner had used earlier that morning (State's ex. 14). He found a bullet in the area where the victim had been, as well as a shell casing. He did not see the petitioner at the club and Freeman told him that the petitioner had left in a truck. App. pp. 280-85.

Once he left the club, Sergeant Willis "rode around McCormick" to see if he could find the petitioner or the petitioner's truck. While he was driving, he received a call

16

that someone was at the home of the petitioner's mother, harassing the family, so he and Chief Deputy Gable then met at her residence around 5:00 a.m. The following day, he found the petitioner' truck after searching an area after the petitioner had given a vague description of where the truck was located. It had been driven off of the dirt roadway, hit a stump and was immobile. There was a black nylon holster in the truck as well as another magazine and a box of ammunition. App. pp. 285-90.

McCormick County Deputy Sheriff Claude Gable, Jr., testified that he also responded to Freeman's Place after the shooting. He later returned again on Sunday, June 30, and photographed the club. He then returned to the jail and met with Sheriff George Reid and Sergeant Willis. Upon being notified that an arrest warrant had been obtained for the petitioner, Deputy Sheriff Gable began searching for him. He corroborated Sergeant Willis' testimony about the dispatch to the home of the petitioner's mother around 5:00 a.m. While he was there, the car that had been harassing the petitioner's family drove by and he stopped it. McDaniel and Murray were in it. App. pp. 299-301.

After resting later that morning, he received a dispatch between 11:45 a.m. and 12:00 p.m., notifying him the petitioner was at the jail. A day or two later, he returned to Freeman's and, with the help of Ms. Freeman, found another bullet that had been lodged in a "frayed place on the floor" (State's ex. 20). App. pp. 301-305.

Vanessa Fambrough had also been present at Freeman's Place on the evening of the shooting, and she witnessed the initial confrontation between the petitioner and the victim in the parking lot. However, she could not hear what was said. Eventually, the confrontation ended and Ms. Fambrough thought the petitioner had left after the victim moved his car. One or two hours later, she was outside the club when she saw the petitioner get out of his truck with a gun in his hand and walk into the club. She then ran to the car of Tabitha Reid, with whom she had come to the club. By the time she reached Ms. Reid's car, she heard three gunshots. App. pp. 312-19.

17

Kevin "Nard" Jennings testified that he knew the petitioner and had known the victim. With respect to the shooting, Jennings said the victim asked why the petitioner kept staring at the victim. Later, the victim asked why the petitioner was standing behind them. When Jennings turned around he saw the petitioner and replied that he did now know why the petitioner was standing there. They kept talking. "[A] little while alter," a shot was fired at Jennings' right shoulder and the victim fell. Jennings turned around and pushed the petitioner in the chest and the petitioner staggered back to the pool table. The petitioner walked back up to the victim and shot him twice more. At that point; the victim was lying on the ground. Once the shooting ended, Jennings stayed on the floor until the petitioner left the area. App. pp. 325-28.

Jennings did not see the victim around with a weapon that night. He admitted that he, Murray and McDaniel drove by the home of the petitioner's mother and that they were armed. App. pp. 328-30.

Clarence Holloway testified that the petitioner worked "under me in the motor pool [in the National Guard] as a mechanic." As he was driving on Highway 281, about eight miles outside of McCormick, Holloway saw the petitioner walking on the side of the road. It was roughly 11:30 a.m. When asked where he was going, the petitioner said that he had wrecked his truck by running over a log in a wooded area and needed a ride to the McCormick County Sheriff's Department to turn himself in because he had gotten into some trouble the previous night.

> He told me he had gotten into an altercation with the deceased, Thomas Wideman. They had an argument. At that time Thomas went under his shirt and showed him a gun and so he proceeded to his truck and went back and got his nine millimeter], came back and he fired two to three rounds hitting Wideman not knowing where.

App. pp. 350-52.

18

Sarah Ann Cannady was yet another person who went to Freeman's Place on June 29-30, 1996. She testified that she knows the petitioner and knew the victim. She witnessed the disagreement between the men in the parking lot. She said that the victim's sister said something disrespectful when the petitioner asked them to move the car, so he could get out of the parking lot. "Eventually he must have cussed the sister out" because the victim told him not to disrespect his sister. At that point, the two men began arguing. Finally, the victim moved his car, and the petitioner got into his blue truck and left with Ben Robertson. App. pp. 367-70.

Ms. Cannady was still in the parking lot when the petitioner returned 15 or 20 minutes later. He walked back into the club and stood at the door, until he heard the D.J. announce that only one song would be played. The petitioner then walked up to the victim and shot him three times. When the shots rang out, the victim fell and the petitioner walked back out of the club.[5] App. pp. 370-73.

SLED Agent David Collins testified that he works in the forensic services laboratory as a firearms examiner. He examined State's exhibit 21, a fired 9mm caliber projectile or bullet, as well as State's exhibit 16, three cartridge casings. All were consistent with 9mm caliber luger ammunition. He likewise examined the petitioner's firearm, State's exhibit 14. His analysis revealed that State's exhibit 14 had fired the fired bullets and the shell casings as well. Moreover, State's exhibit 21 (recovered from the victim's back) was a hollow point bullet, which expands upon impact and are designed to cause more extensive tissue damage to any animal or person that is shot. App. pp. 386-93.

---

[5]About five or ten minutes before the shooting, Robertson had told her that "Jimmy was fixing to shoot this Nigger."

19

**APPLICABLE LAW**

Title 28, United States Code, Section 2254(d) and (e) provides in pertinent

part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

**ANALYSIS**

***Ground One***

In ground one, the petitioner alleges that trial counsel was ineffective for not

(1) objecting to the State's supposedly inflammatory and prejudicial closing argument and

(2) objecting to the allegedly perjured testimony of Claude Gable, Jr.  The respondents

argue that the state court's rejection of the petitioner's argument was not  contrary to and

did not involve an unreasonable application of clearly established federal law, as

determined by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  Claims of

ineffective assistance of counsel are governed by the two-part test established in *Strickland*

*v. Washington*, 466 U.S. 668 (1984).  First, the petitioner "must show that counsel's

20

performance was deficient." *Id.* at 687.  To prove deficiency, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, the petitioner must show that the deficient performance actually prejudiced him. Review of counsel's performance is "highly deferential." *Id.* at 689.

The petitioner claimed at the PCR hearing that parts of the assistant solicitor's closing comments were meant to inflame the jury and were not based on evidence in the record (app. 924-32).  The state PCR judge found that the petitioner had not introduced any probative evidence to support this claim and that the petitioner had proven neither deficient performance or resulting prejudice (app. 906-11).  The state supreme court denied certiorari on this issue, which was issue one in the petition for writ of certiorari, without comment. Accordingly, the relevant decision for this court's review is the order of the PCR judge.  *See Felton v. Barnett*, 912 F.2d 92, 94 (4th Cir.1990) ("[t]he denial of the petition for certiorari was not ... the last state court judgment" for purposes of applying *Harris*, because "the denial of such a writ is not a judgment but is simply a refusal to hear the appeal").

In support of this claim, the petitioner quotes several statements made by the assistant solicitor (*see* app. 700, 703-706, 710).  The assistant solicitor referred to the defense's version of events in general and how that version lacked credibility, the contradiction between the claim of self-defense and the State's physical evidence, the victim's absence, and the bullet that killed the victim.  The petitioner claimed that these comments were calculated, inflammatory, and prejudicial, and that the remarks resulted in the jury being moved by passion instead of focusing upon the evidence.  He also complained because the prosecutor was allowed to argue to jurors that he was not credible, that the prosecutor vouched for the credibility of the State's proof, and that the prosecutor asked jurors to place themselves in the victim's shoes (app. 924-32).

The United States Supreme Court has made clear that a petitioner is not entitled to relief based upon the closing argument of a prosecutor unless that argument so

infected the trial with unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974). The standard in *Donnelly* is a very high standard for a defendant to meet. "'[I]t is not enough that the remarks were undesirable or even universally condemned.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (1983)). "In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *United States v. Young*, 470 U.S. 1, 12 (1985). Furthermore, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 647.

In *State v. Durden*, 212 S.E.2d 587 (S.C. 1975), the state supreme court discussed closing arguments by prosecutors as follows:

> "So long as he stays within the record and its reasonable inferences, *the prosecuting attorney may legitimately appeal to the jury to do their full duty in enforcing the law, or to return the verdict which he conceives it to be their duty to return under the evidence, and it may employ any legitimate means for impressing on them their true responsibility in this respect*, as by stating that a failure to enforce the law begets lawlessness. Thus, he may in effect tell them that the people look to them for protection against crime, and may illustrate the effect of their verdict on the community or society generally with respect to obedience to, and for enforcement of, the law; he has the right to dwell on the evil results of crime and to urge a fearless administration of the criminal law; *and he may ask for a conviction, or assert the jury's duty to convict*. He may argue with reference to any matter which the jurors may properly consider in arriving at their verdict, and may point out as well the matters which they should not consider."

*Id.* at 590 (quoting 23A C.J.S. Criminal Law § 1107) (emphasis added).

The respondents argue that the assistant solicitor's comments did not so infect the trial with unfairness as to make the resulting conviction a denial of due process

under *Donnelly* and, therefore, the petitioner failed to satisfy his burden of proving deficient performance or, more importantly, prejudice under *Strickland*.

When placed in proper context, *Donnelly*, 416 U.S. at 647, the prosecutor's comments that the petitioner had just killed "a defenseless man, and he had to come up with some alternative version of reality," as well as the reference to the petitioner having "nine hours between cold-bloodedly killing this man here and turning himself in ... to create the fiction you all heard from him yesterday," (app. 700), were merely an appropriate argument that the petitioner was guilty of murder and his testimony (app. 571-636), as well as that of his other witnesses, was not credible.   The respondents contend that the testimony from State's witnesses Vanessa Faye Wideman (app. pp. 67-89); Alma R. Freeman (app. pp. 109-118); Margaret Freeman Henderson (app. pp. 137-49); Frank McDaniel (app. pp. 162-84); "Butch" Payton (app. pp. 185-90); Charles Freeman (app. pp. 195-202); Vanessa Fambrough (app. pp. 312-19); and Kevin Jennings (app. pp. 325-30), reasonably tends to prove that the petitioner had an argument with the unarmed victim in the parking lot of a nightclub called Freeman's Place sometime after midnight on the morning of June 30, 1996, and that the incident stemmed from the fact that the vehicle the victim was in was blocking the petitioner's truck from leaving.  A reasonable inference from the evidence presented is that the petitioner left the club and secured a 9 mm semi-automatic weapon.  He then returned to the club and, as the club was preparing to close, shot the victim three times.  Any of the shots fired would have been fatal, but the first shot, which also involved a defensive wound to the right forearm, pierced both lungs as well as the victim's aorta and would have incapacitated him (app. pp. 224-44).

In contrast, the petitioner asserted that the victim had a gun in his hand during the original confrontation in the parking lot.  Following the exchange, the petitioner and Ben Robertson went to buy cigarettes.  When they discovered that the store was closed, they did not simply avoid the victim; rather, they returned to the club.  The petitioner put his

9 mm in his pocket and went inside. Allegedly, another argument ensued after the victim pushed the petitioner. The petitioner then walked toward the victim, who started to draw his weapon. The petitioner then shot him (app. pp. 786-88). As argued by the respondents, based upon the petitioner's account, it is doubtful that he was entitled to a jury charge on self-defense because he was at fault in bringing on the difficulty, the circumstances were not such as would warrant a man of ordinary prudence and courage to strike the fatal blow to save himself from serious bodily harm or losing his own life, and he had other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury other than to act as he did. *See State v. Goodson*, 440 S.E.2d 370, 372 (S.C. 1994). It is clear that this portion of the State's closing argument did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.

Next, the petitioner contends that the prosecutor's statement in the closing argument that the petitioner "took away the daddy of these two small children" "over an argument about a parking space" (app. p. 703) was inflammatory and prejudicial. However, as argued by the respondents, the statement was a proper comment urging the jury to find the petitioner guilty and suggesting that the petitioner did not act in self-defense. All of these comments were supported by the record. The first portion of the challenged testimony is supported by the trial testimony of the victim's sister, Margaret Wideman Henderson, who testified without objection that the victim had a common law marriage and that he had two small children (app. pp. 137-39). Further, the remaining portion of the challenged comments is supported by the record as described above. *See e.g., Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005) ("[P]rosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence.").

Likewise, the prosecutor's reference to the bullet (State's ex. 21) that was removed from the victim's back (app. p. 704) is supported by the record. The testimony of

24

Dr. Yacoub was that she removed this bullet from the victim's back, and she opined that it would have incapacitated him (app. pp. 224-44). Further, SLED Agent David Collins testified that this bullet, which had been fired by the petitioner's weapon (State's ex. 14), was a hollow point bullet which is designed to inflict greater tissue damage when fired at animals or people (app. pp. 388-94). The petitioner also challenges the prosecutor's remarks regarding the victim's bullet wound in his wrist (app. p. 706). However, these remarks merely employed the State's position that the petitioner's account of how the shooting occurred was inconsistent with Dr. Yacoub's autopsy finding.

Finally, the petitioner argues that the State made a Golden Rule argument by asking the jurors to place themselves in the victim's place or in his shoes. The remarks by the prosecutor challenged by the petitioner in this regard are as follows:

> Now, Mr. Mims talked about or used the phrase this could happen to anybody. Anybody could find themselves in this same predicament as Jimmy Gilchrist. Well, I submit to you that anybody could find themselves faced with Jimmy Gilchrist as Thomas Wideman did that night. Look at the results there. Faye Wideman doesn't have a brother anymore; she has a memory. Margaret Wideman doesn't have a brother anymore; she has a memory. What's going to be one of the memories of that family, the Wideman family? What's going to be one of the memories that these children are going to grow up with? These photographs. The three bullets that are arrayed right here in front of you on this witness stand. They have to deal with that for the rest of their life.

(App. p. 710).

In a Golden Rule argument, jurors are urged to place themselves in the position of a party, a victim, or a victim's family member and decide the case from that perspective. *Von Dohlen v. State,* 602 S.E.2d 738, 743-44 (S.C. 2004) (finding that the following comments in the prosecutor's closing argument were improper as the comments encouraged jurors to decide the case based upon passion and prejudice: "This Defendant forces [the victim] at this gun point to take off her shirt, her underwear, her pants and her

25

shoes." "You'll have Margaret's shoes back there" in the jury room. "Her shoes taken off of her, a small size seven shoes-small woman, and this Defendant had her where he wanted her⋯⋯" "You can hear her through her shoes."). The respondents argue that rather than urging the jury to subjectively analyze a case solely or primarily from the victim's viewpoint as in *Von Dohlen* or to ignore their obligation to exercise calm and reasonable judgment, the prosecutor merely reminded the jurors of the consequences of the petitioner's actions – *i.e.,* to deprive family members of their loved one – in order to stress the senselessness and brutality of the petitioner's acts.   The respondents cited several cases from other jurisdictions that have held that more blatant remarks do not deprive a defendant of a fundamentally fair trial.   *E.g., Carr v. State,* 563 S.E.2d 850, 852-53 (Ga. 2002) (prosecutor's action of inviting jury to "be the voice" of the victim did not constitute prosecutorial misconduct and did not properly inflame jurors' emotions, and even assuming that the argument was improper, consideration of the entire record shows there is no reasonable probability that the erroneous comment contributed to the verdict); *Johnson v. State*, 371 S.E.2d 419, 421 (Ga. App. 1988) (prosecutor's closing argument, which implored jury to return a guilty verdict for the benefit of the victims and for the community and county, did not require trial court's rebuke of counsel nor was it grounds for mistrial); *Sanchez v. State,* 41 P.3d 531, 535 (Wyo. 2002) (prosecutor's closing argument in murder trial, which told jury it had the opportunity to speak for victim, was not an improper community outrage appeal and did not unfairly prejudice defendant).   *State v. Willis*, 2001 WL 201316 at *4 (Oh. Ct. App., filed Mar. 2, 2001) (unpublished) (comment during closing argument of murder and robbery trial that jury could be the voice of the victim in the fight against drugs did not prejudice appellant).

This court agrees that the comments of the prosecutor did not deprive the petitioner of a fair trial.   Even if undesirable, the petitioner cannot show how any impropriety in the prosecutor's closing argument so infected the trial with unfairness as to

26

make the resulting conviction a denial of due process. As a result, the PCR court's denial of relief on ground one was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. §2254(d)(1).

The petitioner next asserts that Chief Deputy Claude Gable gave perjured testimony and that trial counsel was ineffective for not objecting to this testimony, which was elicited on cross examination by trial counsel. The respondents argue that the state PCR court's decision was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court. The state supreme court denied certiorari to review the allegations. Therefore, the appropriate decision for this court's review is that of the state PCR court. *Felton*, 912 F.2d at 94.

The PCR court found that the petitioner had not shown either deficient performance or resulting prejudice (app. 909-10). The respondents contend that the PCR court was correct in finding that the petitioner did not present sufficient evidence that trial counsel erred in failing to object to the testimony of Deputy Gable, one of the investigating officers in the petitioner's case. They further argue that the petitioner failed to meet his burden of proof that but for trial counsel not objecting, the outcome of his jury trial would have been different. *Strickland*, 466 U.S. at 687, 694.

The petitioner alleged at the PCR hearing that trial counsel did not impeach Deputy Gable's testimony (app. 922-24). Deputy Gable testified at the petitioner's trial that he pursued and interviewed several witnesses (app. 305-312, 562-70). Trial counsel thoroughly questioned the witness on cross examination regarding his pursuit of witnesses. He inquired about whether witnesses changed their statements (app. 307-308, 562-70). Deputy Gable stated that he pursued all witnesses and turned over all statements received. At the PCR hearing, Deputy Gable maintained that he interviewed all witnesses that were

27

located and turned over all statements obtained in the investigation of the petitioner's case (app. 988-98).

In *Napue v. Illinois,* 360 U.S. 264, 269 (1959), the Court held that due process is generally denied if the government knowingly uses perjured testimony against the accused to obtain a conviction. "The same result obtained when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* In order to meet his burden of proof, a defendant must show that perjured testimony was presented; that the prosecution knew the evidence was false; and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Kyles v. Whitley,* 514 U.S. 419, 433 n. 7 (1995); *Boyd v. French,* 147 F.3d 319, 330 (4th Cir. 1998).

Here, the petitioner's trial counsel thoroughly cross examined each witness, including Deputy Gable and witnesses Tabitha Reid and Derek Ridenhour.[6]  There is no evidence that Deputy Gable withheld any information or that he committed perjury at trial. The petitioner did not proffer any questions that trial counsel allegedly failed to ask and did not present sufficient evidence to show any witnesses' answers at trial would have been different.  Accordingly, the petitioner has not shown that a different approach to cross examination would have been beneficial to the defense, and he has failed to establish prejudice under *Strickland*.  Accordingly, the denial of relief on this ground was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

---

[6]The petitioner alleges that Deputy Gable gave perjured testimony upon cross examination when he testified  that none of the witnesses said they saw the victim with a gun (app. p. 309).  Upon further questioning, Deputy Gable testified that witnesses said someone told them a gun had been taken off the victim, but they did not tell him who took the gun off the victim (app. p. 309).  Deputy Gable further testified that he gave the defense a copy of all the statements (app. p. 308).

***Ground Two***

In ground two, the petitioner asserts that he received ineffective assistance of appellate counsel.  Specifically, he claims that:

> (1)    appellate counsel failed to argue that the State had to disprove self-defense;
>
> (2)    appellate counsel failed to comply with his request concerning the issue he wanted to address for direct appeal;
>
> (3)    appellate counsel failed to argue that the statement admitted at trial violated the confrontation clause of the U.S. Constitution
>
> (4)    the trial judge erred in failing to give a requested charge requested by trial counsel; and
>
> (5)    the trial judge erred in only charging self-defense as set forth in *State vs. Davis*, 317 S.E.2d 452 (1984).

(Habeas pet. 6-7).  Each of these allegations was presented to the state supreme court on certiorari, and the state supreme court granted certiorari as to counsel's "failure to raise issues regarding the adequacy of the self-defense jury charge and the refusal of the trial judge to give an appearances charge."  It summarily denied certiorari as to the remaining issues (6/23/04 order).  The respondents argue that the state court's denial of relief with respect to these allegations was not contrary to and did not involve an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.

A defendant is constitutionally entitled to effective assistance of appellate counsel.  *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).  "However, appellate counsel is not required to raise every non-frivolous issue that is presented by the record."  *Thrift v. State*, 397 S.E.2d 523, 539 (S.C. 1990) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)).  Appellate counsel has a professional duty to choose among potential issues according to their merit.  *Jones*, 463 U.S. at 752-53.  Where the strategic decision to exclude certain issues on

29

appeal is based on reasonable professional judgment, the failure to appeal all trial errors is not ineffective assistance of counsel.  *Griffin v.* Aiken, 775 F.2d 1226, 1234 (4th Cir. 1985).  "When a claim of ineffective assistance of counsel is based upon failure to raise viable issues, the court must examine the record to determine whether appellate counsel failed to present significant and obvious issues on appeal."  *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986).  Generally, the presumption of effective assistance of counsel will be overcome only when the alleged ignored issues are clearly stronger than those actually raised on appeal.  *Id.*

The petitioner testified that he drove away from the crime scene, returned, and placed his gun in his pants before reentering the club after his initial confrontation with the victim (app. 587-95).  Upon reentering the club, the petitioner did not see a gun when the victim pushed him (app. 592).  The petitioner did not leave at this time (app. 594-600). The victim stared at the petitioner for approximately 45 minutes (app. 596-97).   The petitioner did not leave at this time.  The petitioner, with his gun in his pants, walked toward the victim (app. 599-600).

The trial court instructed:

> If the self-defense claim is based on their actually being an imminent danger, then the circumstances must have been such that would warrant a person of ordinary prudence, firmness, and courage to strike back in the manner that the defendant did. If the defense relates to a belief that the defendant was in such imminent danger, then the circumstances must have been such that a reasonably prudent person or ordinary firmness and courage could have entertained the same belief, the same belief that he was in imminent danger of losing his life or sustaining serious bodily injury.

(App. 720-21; *see* app. 728).

The petitioner contends that the trial judge failed to give the jury an "appearances charge," and his appellate counsel was ineffective for failing to raise this issue on appeal.  "A defendant is entitled to an appearances charge where the claim of

self-defense arises from a mistaken appearance of danger." *Gilchrist v. State*, 612 S.E.2d 702,705 (S.C. 2005) (citing *State v. Starnes*, 531 S.E.2d 907 (S.C. 2000)). The state supreme court found that "appellate counsel is not ineffective for failing to raise on appeal an issue that was not preserved for review," and that "trial counsel's submission of the request to charge, without any further explanation of his point, was insufficient to preserve for review the trial court's failure to charge the specific language regarding 'a right to act on appearances.'" *Id.* The court explained that:

> In *State v. Johnson*, 333 S.C. 62, 66, 508 S.E.2d 29, 31 (1998), we set out this preservation rule: "[W]here a party requests a jury charge and, after opportunity for discussion, the trial judge declines the charge, it is unnecessary to preserve the point on appeal, to renew the request at conclusion of the court's instructions." When given the opportunity, counsel must articulate a reason for the requested charge. Counsel need not object to the charge when given if the basis of the requested charge is clear from the record. It is not for the trial judge to study the requested charge and make an informed decision with no further input from counsel, especially in a situation such as this where there is only a subtle difference in the language of the judge's proposed charge and the language of the request.

*Id.* (footnote omitted). In a footnote, however, the state court noted that "[I]n recent cases ... we have found such a charge does not cover an appearances charge." *Id.* at 705 n.2. Alternatively, the state supreme court found that appellate counsel was not ineffective for failing to raise this issue. Observing that "[a]ppellate counsel is not required to raise every nonfrivolous issue that is presented by the record," the state supreme court found that "Petitioner's claim of self-defense did not rely on a mistaken appearance of danger [noting that the petitioner introduced evidence the victim was actually armed with a gun at the time of the shooting]. The failure to give an appearances charge was therefore not reversible error and appellate counsel was not ineffective for failing to argue this issue on appeal." *Id.* at 705. *See also State v. Starnes*, 531 S.E.2d 907, 912 (S.C. 2000). This court agrees.

The state supreme court likewise found that appellate counsel was not ineffective for not raising as an issue on appeal that the trial judge had denied the following requested charge: "If a person is assaulted while in a club of which he is a member and without fault in bring[ing] on the difficulty, he is not bound to retreat in order to invoke the benefit of the doctrine of self-defense, but may stand his ground and repel the attack with as much force as is reasonably necessary." *Gilchrist*, 612 S.E.2d at 706. The court noted that this proposed instruction was based upon its holding in *State v. Marlowe*, 112 S.E. 921 (S.C. 1922), where it had held "it was error to refuse to charge that 'the law of retreat does not apply to a club member when attacked by another in the club rooms' because '[a] man is no more bound to allow himself to be run out of his rest room than his workshop.' 112 S.E. at 922." *Gilchrist*, 612 S.E.2d at 705-06.

The state court found that the present case was factually distinguishable from *Marlowe* because "the 'club' in which the shooting occurred was a 'dance club' which charged $5 for admission" and "[t]here is no evidence petitioner was a 'member' of this club." *Id.* at 706. As a result, it concluded that "the trial judge did not err in refusing the charge and appellate counsel was not ineffective for failing to raise the issue on appeal." *Id.* The state supreme court overruled "the analysis in *State v. Marlowe* elevating a 'club' to the possessory status of a home or place of business. This expansion of the immunity-from-retreat doctrine is not good public policy, especially in the contemporary context of 'private clubs.'" *Id.*

As argued by the respondents, the petitioner is merely complaining about a violation of state law, and federal habeas corpus relief is not available to correct errors of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) and citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984)). "Today, we reemphasize that it is not the province of a federal habeas court to reexamine

32

state-court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* (citing 28 U.S.C. § 2241 and *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam )) (footnote omitted).  Accordingly, the claims fail.

With respect to the petitioner's allegation that appellate counsel was ineffective because he did not argue that the trial court erred by failing to charge the jury that he did not have the burden of proving self-defense, the state supreme court affirmed pursuant to "*Legge v. State*, 349 S.C. 222, 562 S.E.2d 618 (2002) (appellate counsel not ineffective for failing to raise an issue where no objection was preserved at trial); *State v. Addison*, 343 S.C. 290, 540 S.E.2d 449 (2000) (charge regarding State's burden to disprove self-defense should be given if requested but only for cases tried after the filing of this Court's opinion in *State v. Wiggins*, 330 S.C. 538, 500 S.E.2d 489 (1998))."  As to his remaining claims related to the self-defense charge, the court cited "*State v. Burton*, 302 S.C. 494, 397 S.E.2d 90 (1990) (no error where charge given adequately covered substance of requested charge)."  *See Gilchrist*, 612 S.E.2d at 706.

The state supreme court determined that its decision in *State v. Wiggins* did not apply to this case, which was tried before *Wiggins* was decided.  This construction of when a change in state law should become effective is purely a state law issue under *Estelle v. McGuire*, 502 U.S. at 67-68.  The petitioner was not prejudiced by appellate counsel's supposed error, since he would not have been entitled to the requested charge. Therefore, denial of relief on this allegation was not contrary to and did not involve an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.

Next, the petitioner asserts that appellate counsel failed to raise issues the petitioner wanted addressed on direct appeal.  However, this claim was procedurally defaulted in state court because the petitioner did not obtain a ruling on it by the PCR judge

33

in the order of dismissal.  *See Pruitt v. State*, 423 S.E.2d 127, 128 (S.C. 1992) (issue must be raised to and ruled on by the PCR judge in order to be preserved for review); *Plyler v. State*, 424 S.E.2d 477, 478 (S.C. 1992) (same).  If a petitioner before a federal district court fails to raise a claim in state court, and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in state courts.  In such a case, a federal district court is barred from considering the habeas claim absent a showing of cause and actual prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice, as the exhaustion requirement is technically met and the rules of procedural bar apply.  *Matthews v. Evatt*, 105 F.3d 907, 916 (4th Cir. 1997) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).  The petitioner has failed to make such a showing.  In particular, he cannot show prejudice from the default, since the United States Supreme Court has never imposed such an obligation on appellate counsel.  To the contrary, the Court held in *Jones v. Barnes,* 463 U.S. 745 (1983), that appellate counsel has no constitutional duty to raise every nonfrivolous issue on appeal if counsel, as a matter of professional judgment, decides not to raise such issue on appeal.  *Id.* at 751-54.  "The *Barnes* Court reasoned that counsel must be allowed to exercise his reasonable professional judgment in selecting those issues most promising for review and, in this respect, specifically stated that '[a] brief that raises every colorable issue runs the risk of burying good arguments. . . .' *Id.* at 752-53."  *Griffin v. Aiken*, 775 F.2d 1226, 1235 (4th Cir. 1985).  Here, the petitioner has not demonstrated an issue that would have been more likely to have been successful than those raised by his appellate.  *Id*.

The petitioner next claims that his appellate counsel failed to argue that a statement admitted at trial violated the Confrontation Clause.[7]   This claim is also procedurally defaulted, and the petitioner has failed to make a showing of cause and actual

---

[7]In a memorandum submitted in support of his habeas petition, the petitioner argued that the statement was one "that Sarah Cannady attributed to Ben Robertson" (mem. in supp. habeas pet. 23).

prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice.  Accordingly, the claim fails.

### Ground Three

Lastly, the petitioner again raises issues pertaining to the self-defense charge that are discussed in ground two.  As discussed above, the state supreme court's denial of relief on this allegation did not result in a decision that was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.  Therefore, the claim fails.

### CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the respondents' motion for summary judgment be granted.


s/William M. Catoe
United States Magistrate Judge

January 31, 2007

Greenville, South Carolina